**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ANDREW L. CIBULA, Individually,
and as parent and next friend of
his minor son J.A.C.; JENNIFER L.
CIBULA, Individually, and as parent
and next friend of her minor son
J.A.C.,

       *Plaintiffs-Appellees,*

       v.

UNITED STATES OF AMERICA,

       *Defendant-Appellant.*

No. 10-1245

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:05-cv-01386-GBL-TRJ)

Argued: September 20, 2011

Decided: January 9, 2012

Before MOTZ, GREGORY, and DUNCAN, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published
opinion. Judge Motz wrote the opinion, in which Judge Gregory and Judge Duncan joined.

---

**COUNSEL**

**ARGUED:** William George Cole, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Bruce Jay Klores, KLORES PERRY MITCHELL, PC, Washington, D.C., for Appellees. **ON BRIEF:** Tony West, Assistant Attorney General, William Kanter, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellant. Thomas W. Mitchell, BRUCE J. KLORES & ASSOCIATES, P.C., Washington, D.C., for Appellees.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This Federal Tort Claims Act ("FTCA") case returns to us after remand to the district court. *See Cibula v. United States*, 551 F.3d 316, 317 (4th Cir. 2009) (*Cibula I*).

The FTCA waives the federal Government's sovereign immunity in tort actions, making the United States liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. Courts determine the Government's liability "in accordance with the law of the place where the [negligent] act or omission occurred." 28 U.S.C. § 1346(b)(1); *Starns v. United States*, 923 F.2d 34, 37 (4th Cir. 1991). In *Cibula I*, we held that the district court erroneously applied Virginia law in determining that an award for future care costs could not be placed in a reversionary trust. We remanded the case for the court to apply California law, and "craft a remedy that holds the government liable 'in the same manner and to the same extent as a private individual under like circumstances.'" *Cibula I*, 551 F.3d at 321-22 (quoting 28 U.S.C. § 2674).

On remand, the district court held it could not provide the Government with a reversionary interest in the future care award that "would comply with" both the FTCA and California law. The United States appeals. For the reasons set forth within, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

We first briefly describe the proceedings resulting in our initial opinion in this case and then set forth those leading to the present appeal.

## A.

## 1.

After the negligence of Government doctors in California caused significant and irreversible brain damage to J.C., his parents, Andrew and Jennifer Cibula, brought this FTCA suit against the United States in the Eastern District of Virginia on behalf of themselves and J.C. Following a bench trial, the district court found the United States liable for J.C.'s damages and awarded the Cibulas $2,704,800 for past care costs, $250,000 for J.C.'s pain and suffering, $250,000 for Mrs. Cibula's pain and suffering, $2,360,771 for J.C.'s lost future earnings, and, most relevant to this appeal, $22,823,718 for J.C.'s future care costs.

In determining the amount of the future care award, the district court relied on the testimony of the Cibulas' expert, Dr. Richard Lurito, a Ph.D. economist, who had previously testified as an expert in more than 700 cases. To calculate the cost of J.C.'s future care, Dr. Lurito assumed that J.C. would live a normal life expectancy, which at the time of trial was an additional 64.8 years. Dr. Lurito based his calculations on the analysis of Dr. Raphael Minsky, another expert retained by the Cibulas, as to the care and services J.C. would need over

those 64.8 years. At trial, Dr. Lurito testified that a present value award of $22,823,718 would allow J.C. "if he earned four and a quarter percent after tax on his investment [annually] . . . to reach into this pool of money, withdraw what he needs to pay for each of these medical care needs, and at the end of his expected life, there would be nothing left." This amount would allow J.C. to live at home, rather than the far less expensive figure ($11,831,347) necessary to fund his needs at a residential care facility.

Dr. Lurito emphasized that his calculations took a "conservative" approach. He acknowledged that he did not consult any authorities on "annuities" and so did not know if "considerably less" funds would produce an income stream sufficient to meet all of J.C.'s future care needs. Nevertheless, the district court relied on Dr. Lurito's testimony to conclude that a present value award of $22,823,718 was "the amount of money that is needed today, if invested prudently for the rest of J.C.'s life, to pay for the care that J.C. will need each year, such that no money will be left at the end of his normal life expectancy."

The United States argued that California law permitted it to retain a reversionary interest in this future care award. The district court rejected this argument because it concluded that Virginia law governed and did not permit this remedy. Applying Virginia law, the district court ordered the $22,823,718 future care award be placed in a non-reversionary "trust for J.C.'s benefit" to be established and managed by a court-appointed guardian ad litem.

2.

On appeal in *Cibula I*, neither the United States nor the Cibulas challenged the district court's finding of liability, calculation of the present value of the future care damages, or placement of the calculated future care damages in a trust to be managed by a court-appointed guardian ad litem.

However, the United States did challenge the district court's refusal to create a reversionary trust. The United States contended that the district court should have applied California law and, pursuant to that state's law, should have ordered the present value future care award be placed into a reversionary trust. The United States relied on section 667.7 of the California Civil Procedure Code. That statute accords any party in a medical malpractice action the right to elect that future damages "be paid in whole or in part by periodic payments rather than by a lump-sum payment if the award equals or exceeds fifty thousand dollars," Cal. Civ. Proc. Code § 667.7(a), and permits periodic payments (other than those awarded for loss of future earnings) to be "subject to modification in the event of the [plaintiff's] death." *Id.* § 667.7(b)(1), (c); *Salgado v. County of Los Angeles*, 967 P.2d 585, 589 (Cal. 1998).

Because courts cannot subject the United States to continuing obligations like periodic payments, *see, e.g.*, *Hull v. United States*, 971 F.2d 1499, 1505 (10th Cir. 1992), the Government sought to pay the entire future care award as a lump sum into the trust created by the district court but retain a reversionary interest in any funds remaining in trust at the time of J.C.'s death. Such a remedy would make the entire future care award immediately available to J.C.'s trustee to invest and provide for him, but also ensure that the United States would receive any funds remaining in the trust at the time of J.C.'s death. The Government contended that in this way its proposal would properly approximate the periodic payment scheme available under California law.

We agreed with the Government that the district court erred by not applying California law. Accordingly, we remanded the case, instructing the district court to apply California law and "craft a remedy that holds the government liable 'in the same manner and to the same extent as a private individual under like circumstances.'" *Cibula I*, 551 F.3d at 321-22 (quoting 28 U.S.C. § 2674).

B.

On remand, the district court requested proposals from the Cibulas and the Government as to how it should "craft a remedy" consistent with California law.

The Cibulas made two proposals. They proposed that the Government pay not the present value future care damages award ($22,823,718) but the estimated gross costs of J.C.'s future care (approximately $119,000,000)[1] into a reversionary trust "to ensure that J.C. is sufficiently compensated." Alternatively, they proposed that the United States pay only the present value award into a reversionary trust but remain liable to them for the estimated gross costs in the event the present value award proved insufficient. The district court rejected both proposals, holding the first placed too onerous a burden on the Government in relation to a private defendant in like circumstances under California law, and the second imposed an impermissible continuing obligation on the United States. *See Cibula I*, 551 F.3d at 319 (noting "the FTCA has been interpreted to prohibit ongoing obligations against the United States"). The Cibulas do not challenge these holdings on appeal.

The United States proposed that it pay J.C.'s trust a "lump sum" payment "equal to the future care costs . . . awarded at trial," i.e., $22,823,718, and "retain [a] reversionary interest[ ]" in that trust "should J.C. not survive for his full life expectancy or if funds remain at the expiration of his life expectancy." The district court rejected that proposal, finding that it too failed to treat the United States sufficiently like a private defendant under California law because it risked underfunding J.C.'s future care. The district court based this finding on new evidence the Cibulas introduced at a post-trial,

---

[1]The Cibulas derived this figure from an expert report they submitted to the district court on remand. At trial, the Cibulas presented only Dr. Lurito's present value calculations.

post-remand hearing held in November 2009. At that hearing a new expert retained by the Cibulas, Dr. James Koch, opined that the recent economic downturn made unattainable the "conservative after tax discount rate of 4.25%" that Dr. Lurito, the Cibulas' trial expert, calculated and the district court accepted in finding the present value award of $22,823,718 as the amount necessary "to pay for the care that J.C. will need each year" in the future.

The district court concluded that it was unable to craft a suitable reversionary trust that reconciled "the competing objectives" of the FTCA and California law. Accordingly, the court ordered the present value future care award of $22,823,718 "be placed into a special needs trust for the benefit of J.C." to be administered by his guardian ad litem, but which contained no reversion provision. The United States again appeals, contending that the district court erred by refusing to order the future care award be placed into a reversionary trust. The Cibulas have filed no cross-appeal.

## II.

## A.

As we held in our earlier opinion, California law controls the manner and extent of the liability of the United States in this case. *See Cibula I*, 551 F.3d at 321-22. California law permits a private defendant in a medical malpractice action to elect *not* to make a lump sum award but instead to compensate a plaintiff for future damages by periodic payments, which largely cease upon the plaintiff's death. Cal. Civ. Proc. Code § 667.7. Enacted as part of the Medical Injury Compensation Reform Act ("MICRA"), this provision serves the twin legislative purposes of

> [1] provid[ing] compensation sufficient to meet the needs of an injured plaintiff . . . for whatever period is necessary while [2] eliminating the potential wind-

fall from a lump-sum recovery which was intended to provide for the care of an injured plaintiff over an extended period who then dies shortly after the judgment is paid, leaving the balance of the judgment award to persons and purposes for which it was not intended.

*Id.* § 667.7(f).

Upholding the constitutionality of this provision, the Supreme Court of California concluded that it was "rationally related to the legitimate objective of reducing insurance costs." *Salgado*, 967 P.2d at 589 (citing *Am. Bank & Trust Co. v. Cmty. Hosp.*, 683 P.2d 670 (Cal. 1984)). The court explained that in furthering this objective the statute accords medical malpractice defendants certain benefits. A defendant's election to pay out a large future damages award periodically, rather than in an upfront lump sum, permits a defendant or typically its insurer to "retain fewer liquid reserves and to increase investments," thereby reducing costs. *Id.* ("As the legislative history of MICRA indicates, one of the factors which contributed to the high cost of malpractice insurance was the need for insurance companies to retain large reserves to pay out sizable immediate lump sum awards."). Likewise, the termination upon death provision "obviously" serves to reduce a defendant's "insurance costs." *Id.*

The *Salgado* court further recognized that in addition to benefitting defendants by reducing insurance costs and preventing windfalls in the event of a plaintiff's premature death, the legislature sought to assure plaintiffs adequate compensation over the life of the award. Thus, the legislature provided that defendants opting to make periodic payments must be adequately insured or must "post security adequate to assure full payment." Cal. Civ. Proc. Code § 667.7(a). To further guard against non-payment, the statute authorizes courts to hold delinquent defendants in contempt of court and order

them to pay "all damages caused by the failure to make such periodic payments, including court costs and attorney's fees." *Id.* § 667.7(b)(2). Of course if either party opts for periodic payments, in exchange for this guarantee of fixed future payments, a plaintiff forfeits the flexibility accorded a plaintiff who receives an immediate lump sum payment. *See id.* § 667.7(f) (providing that once "all elements of the periodic payment program [are] specified with certainty in the judgment ordering such payments" neither party may seek "modification at some future time which might alter the specifications of the original judgment").

## B.

Both the Cibulas and the Government recognize that due to the Government's inability to shoulder continuing obligations, *see, e.g.*, *Hull*, 971 F.2d at 1505, the FTCA permits courts to craft remedies that "approximate" state periodic payment statutes, including reversionary trusts. *See Dutra v. United States*, 478 F.3d 1090, 1092 (9th Cir. 2007) (holding that "nothing in the FTCA prevents district courts from ordering the United States to provide periodic payments in the form of a reversionary trust" in order to "approximate the results contemplated by state statutes"); *Hill v. United States*, 81 F.3d 118, 121 (10th Cir. 1996) (holding district court could create a reversionary trust that "would approximate the result contemplated by" state periodic payment statute). Our opinion in *Cibula I* suggested as much, as we remanded for the district court to craft a remedy consistent with California's periodic payment statute while acknowledging that "the FTCA has been interpreted to prohibit ongoing obligations against the United States." 551 F.3d at 319, 321-22. Indeed, both parties urged the district court on remand to fashion a reversionary trust that (in their respective views) would approximate the periodic payments contemplated by § 667.7.

Of course, the parties disagree as to the amount necessary for a reversionary trust to approximate California law. The

Government argues that its proposal—placing the present value future care award, i.e., $22,823,718, into a reversionary trust—"closely resembles" the liability of a private defendant under § 667.7. Appellant's Br. at 29.

The Cibulas contend that to approximate California law, the corpus of the reversionary trust must be the *gross* future care costs, not the *present* value damages that the district court awarded. However, *Salgado*, the case on which the Cibulas rely, offers them no support here. The admonition in *Salgado* that trial courts applying § 667.7 must "fashion the periodic payments based on the *gross* amount of future damages" was driven by the concern that if "a present value award is *periodized*, a plaintiff might not be fully compensated for his or her future losses." *Salgado*, 967 P.2d at 590 (internal quotation omitted) (second emphasis added). In such a case, "the judgment, in effect, would be discounted twice: first by reducing the gross amount to present value and second by deferring payment." *Id.* (internal quotation omitted). The *Salgado* court was rightly concerned that a plaintiff receiving a discounted award *over time* would receive far less than a plaintiff receiving the same award in an immediately invest-able *lump sum. See id.* at 591 (explaining that pursuant to § 667.7, "the plaintiff is entitled to receive, over time, the equivalent of the immediate lump-sum award at the time of judgment . . . i.e., the amount that the . . . award would have yielded if invested prudently at the time of judgment").

The concerns the *Salgado* court addressed are not present in this case. Under the Government's proposal, J.C.'s trust would receive the *entire* present value award up front in a lump sum. Thus, the Cibulas would not be deprived of the anticipated investment benefit inherent in a present value calculation. *See id.* at 592 (explaining that the generally accepted practice of discounting future damages "estimate[s] . . . the *actual* amounts that plaintiff would have received" over the years (emphasis added)). In other words, the reversionary trust the Government seeks would not result in the same dou-

ble discount that was of concern in *Salgado*. Rather, the trustee could immediately invest the entire future care award, which the Government must pay up front, allowing J.C. to reap the investment benefit of that award over the life of the award.

Of course, the Cibulas are correct that a lump sum present value award may prove inadequate to cover all of J.C.'s future care costs, but denying the Government a reversionary interest does nothing to mitigate this possibility.[2] A reversionary interest would result in payment to the Government only if the trust *over*-performed or if J.C. died prematurely. In neither case would the reversionary interest impact the sufficiency of the award. Indeed, in both of these situations the trust would have proved more than adequate to cover all of J.C.'s future care costs, as only those funds remaining in trust *after* full payment of these costs would revert to the Government.

The Cibulas also rely on the district court's holding that the Government's proposal ran "the risk of under compensating J.C.," because the recent economic decline made the 4.25 percent investment rate relied on by the Cibulas' expert in reaching the $22,823,718 figure "unattainable." In making this finding, the district court relied entirely on testimony from the Cibulas' *new* post-trial, post-remand expert.

The Government contends that the district court erred in so holding because (1) the new evidence looked only at a short window of time rather than taking an appropriate long-term, historical view of economic forecasting; and (2) the court violated the mandate rule by finding the amount of the future

---

[2]Alternatively, the Cibulas suggest that as compensation for bearing the risk that the lump sum will prove inadequate, they should be allowed to retain any funds remaining in trust at the time of J.C.'s death. A jury, or even a legislature, certainly could accept this argument. The California legislature, however, has not done so. *See* Cal. Civ. Proc. Code § 667.7(f) (seeking to "eliminat[e] the potential windfall from a lump-sum recovery").

care award, which was not challenged on appeal, was no longer sufficient to fund J.C.'s future care due to changed economic conditions. *See Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007). We agree that the district court was bound by its initial finding—unchallenged on appeal—that the amount of the lump sum award was sufficient to meet J.C.'s future care needs and was equivalent to the present value of J.C.'s future damages.

Moreover, even if the district court could have taken into account the changed economic conditions, it failed to explain the relevance of those changes to the only issue before it. Because the Cibulas have never challenged the sufficiency of the $22,823,718 present value award for J.C.'s future care costs (which the district court based on the calculations of the Cibulas' own expert), or the placement of those funds in a trust to be managed by J.C.'s guardian ad litem, the only issue before the district court was the Government's entitlement to a reversionary interest in that award. The district court offered no rationale as to why granting the Government a reversionary interest would impact the *sufficiency* of the award. And we see none.

Allowing the Government to retain a reversionary interest in the lump-sum, present-value judgment without remaining liable for the gross costs of J.C.'s future care does not duplicate California law. It seems to us, however, that it does sufficiently approximate that state's law. In exchange for release from a continuing obligation that the Government cannot undertake, the Government must make a large lump sum payment to J.C.'s trust up front, and, thus, forego the retention and investment benefits available to private defendants making periodic payments under California law. Requiring the Government to make this immediate large lump sum payment provides the Cibulas with the ability, unavailable to plaintiffs receiving periodic payments under California law, to invest this large sum throughout their child's life.

The district court expressly found that this amount would be sufficient, if invested conservatively, to provide for all of J.C.'s care during his lifetime. And, although the Cibulas have no guarantee that the lump sum payment will cover all of J.C.'s future care costs, no party has suggested the district court is without the authority to fashion a reversionary trust that would allow the Cibulas flexibility in paying for J.C.'s future care.

For example, some portion of the trust funds could purchase an annuity to guarantee "a stream of periodic payments" while investing the remainder of the funds.[3] *See Salgado*, 967 P.2d at 592-93 & n.3. Because the district court fashioned the present value award based on its conclusion that J.C. had a normal life expectancy, 64.8 additional years, the cost of an annuity to fund the full value of J.C.'s future care costs could be significantly less than the $22,823,718 lump sum award ordered by the district court. *See id.* at 592 n.3 (explaining that an annuity can well "reduce . . . overall out-of-pocket costs" because, although a "jury, based on the evidence presented at trial, concludes that the plaintiff has a fairly long life expectancy, life insurance companies, after reviewing the plaintiff's medical records and applying actuarial principles, frequently are willing to assume a shorter life expectancy and price an annuity accordingly"). Allowing the Cibulas this type of flexibility would provide an advantage over the fixed, non-modifiable periodic payments that § 667.7 dictates for plaintiffs in cases in which defendants remain liable on the judgment. *See Am. Bank & Trust*, 683 P.2d at 684 (Mosk, J., dissenting) (maintaining that periodic payments "prevent[ ] the victim from using the entire amount of the judgment as his needs require" and thus deprive him "a financial safety valve . . . for unexpected expenses connected with his injury during the course of his life").

---

[3]We, of course, leave it to the district court on remand to determine the viability of purchasing an annuity. Indeed, we express no view as to how the district court should fashion the trust on remand other than to incorporate a reversionary clause in favor of the Government.

### III.

Because granting the Government a reversionary interest in
J.C.'s future care award eliminates the potential for a windfall
without in any way rendering the award less sufficient com-
pensation for J.C., we find such a remedy approximates
§ 667.7 in a manner that is consistent with the FTCA. Accord-
ingly, we remand the case with instructions for the district
court to fashion such a remedy; we affirm in all other respects.[4]

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

---

[4]The Government, in arguing that it also is entitled to a reversionary
interest in J.C.'s lost future earnings, fails to acknowledge the language in
*Salgado*, 967 P.2d at 589, explaining that future *earnings* damages are not
subject to termination upon a plaintiff's death. Nor, in briefing to this
court, does the Government cite any case law to the contrary. Based on
*Salgado* and given that § 667.7 expressly aims to prevent a potential
"windfall from a lump-sum recovery which was intended to provide for
the *care* of an injured plaintiff" (emphasis added), we are not persuaded
that the district court erred in denying the Government a reversionary
interest in the damages awarded for J.C.'s lost future earnings.