[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13780
_____

D.C. Docket No. 1:15-cv-23502-RNS

MARLA DIXON and
EARL REESE-THORNTON, SR.,
Individually and as parents and natural guardians of
E.R.T., JR., a minor,

Plaintiffs-Appellees-Cross Appellants,

versus

UNITED STATES OF AMERICA,

Defendant-Appellant-Cross Appellee.
_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(August 17, 2018)

Before TJOFLAT and ROSENBAUM, Circuit Judges, and URSULA UNGARO,[*] District Judge.

ROSENBAUM, Circuit Judge:

The fictional Angus MacGyver's defining talent is his ability to cobble together a solution when the precise tools he needs to solve a problem are not available.[1]   As "Mac" has explained, "If you don't have the right equipment for the job, you just have to make it yourself."  *MacGyver: Out in the Cold* (ABC television broadcast Feb. 16, 1987).  So synonymous with improvising has the name "MacGyver" become that the Oxford Dictionaries added the name to their collection as a verb meaning to "[m]ake or repair (an object) in an improvised or inventive way, making use of whatever items are at hand." https://premium.oxforddictionaries.com/us/definition/american_english/macgyver.

The Federal Tort Claims Act's ("FTCA") directive making the federal government liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, requires courts to MacGyver a remedy in fashioning tort-damages awards against the United States,

---

[*] The Honorable Ursula Ungaro, United States District Court for the Southern District of Florida, sitting by designation.

[1] Angus MacGyver is the lead character in the television series *MacGyver*, a show that centers on MacGyver's use of scientific knowledge to solve problems and to extricate himself and his team members from danger.  The original version of *MacGyver*, starring Richard Dean Anderson, ran from 1985 through 1992.  *MacGyver* (original), IMDb, https://www.imdb.com/title/tt0088559/?ref_=nv_sr_2 (last visited Aug. 13, 2018).  In 2016, the series was rebooted, this time with Lucas Till playing the name character.  *MacGyver* (reboot), IMDb, https://www.imdb.com/title/tt1399045/?ref_=nv_sr_1 (last visited Aug. 13, 2018).

2

where the unique aspects of the federal government make it difficult or impossible to strictly apply a state damages statute to the government. In those situations, courts must approximate the statutory remedy as closely as they can to achieve the ends required by the FTCA.

Here, we review the district court's efforts in improvising application of Florida's medical-malpractice-damages statute, section 768.78(2) of the Florida Statutes, to Appellant-Cross-Appellee United States. Following a bench trial, the United States was held liable upon the district court's finding that a doctor at a federal health facility caused Plaintiffs-Appellees-Cross-Appellants' son E.R.T., Jr. ("E.R.T."), to suffer severe and life-altering injuries at the time of his birth. On appeal, the government challenges the district court's application of section 768.78(2) to the method of payment the district court chose for the government to satisfy the judgment against it. Plaintiffs, meanwhile, cross-appeal the district court's jerry-rigging of section 768.78(2)'s bond requirement as the court found it pertains to the United States. The district court did an admirable job of MacGyvering a solution in this case, and we affirm much of what it did. Nevertheless, for the reasons that follow, we must reverse discrete portions of the district court's judgment and remand for further proceedings consistent with this opinion.

3

**I.**

E.R.T. was born at the North Shore Medical Center.  Dr. Ata Atogho, an employee of a federally supported community health center, delivered him.

Unfortunately, the birth was a difficult one.  During the process, Dr. Atogho violated the requisite standard of care and caused E.R.T. to experience profound brain damage.  As a result, E.R.T. is in "a near persistent vegetative state."  He will need round-the-clock care for the rest of his life, and his condition is not expected to ever significantly improve.  E.R.T. has a life expectancy of 30 years.

Faced with this reality, E.R.T.'s parents, Plaintiffs-Appellees-Cross Appellants Marla Dixon and Earl Reese-Thornton, Sr., filed suit against the United States under the FTCA and Florida law.  In their complaint, they asserted two FTCA claims against the United States:  one for Dr. Atogho's medical negligence and one for the vicarious liability of the community health center for Dr. Atogho's medical negligence.

Following a bench trial, the district court found the United States liable to Dixon and Reese-Thornton, Sr., for Dr. Atogho's negligence.  Among other damages, the district court concluded that Plaintiffs would suffer a total of $20,965,146 in future economic damages, consisting of E.R.T.'s future medical expenses and the loss of E.R.T.'s future earnings, with a present money value of $13,860,943.91.

The district court then had to decide how any damages awarded should be paid. Section 768.78(2) of the Florida Statutes allows a defendant in a medical-malpractice case to make payment of future economic damages either by lump-sum payment for all damages, with future economic damages and expenses reduced to present value, or by periodic payments. Fla. Stat. § 768.78(2). If a party chooses to make periodic payments, the amount of the payments "shall equal the dollar amount of all future damages before any reduction to present value." Fla. Stat. § 768.78(2)(b)(1). A party who wishes to make periodic payments must post a bond or other security to ensure full payment of the damages awarded. *Id.* at § 768.78(2)(b)(2).

Invoking this statute, the United States requested that any future-economic-damages award to Plaintiff be paid in periodic payments, rather than a lump-sum payment. But it asserted that, unlike a private party, the United States cannot be subject to continuing obligations under the FTCA.[2] For this reason, the United States requested to pay the entire amount of future economic damages, not reduced to present money value, into the district court's registry for distribution to Plaintiffs on a periodic basis. And in the case that E.R.T. died before turning 30 years old,

---

[2] Whether, in fact, the FTCA precludes the United States from being required to pay damages as a continuing obligation is not at issue in this appeal. We therefore take no position on that question. For an explanation of why other courts have concluded that the FTCA does not allow the United States to be subject to a continuing obligation see, e.g., *Hull v. United States*, 971 F.2d 1499, 1504-05 (10th Cir. 1992).

the United States sought for the district court to order any remaining funds in the court's registry to revert to the United States. Finally, the United States posited that though it advocated for periodic payments to be made from the funds in the court's registry, the deposit of the full funds would itself act as the security ensuring payment of the full award in the future. So, the government reasoned, no separate bond was necessary.

The district court granted the government's request to make a single payment into a trust[3] for periodic disbursement to Plaintiffs. But it denied the government's plea for a reversionary interest in the monies the government deposited. Nevertheless, the district court agreed that the government's deposit of the total award in the trust served the purpose of section 768.78's bond requirement, so it did not require the United States to pay a bond.

But the United States later suggested that its agreement to pay the full award was qualified, based on the availability of government funds for that purpose.[4] So Plaintiffs urged the district court to require the United States to pay a bond to

---

[3] The district court concluded that Rule 67, Fed. R. Civ. P., does not authorize payment of future economic damages into the court's registry. Rather, the court reasoned, the same effect could be achieved by ordering the United States to deposit the full award of future economic damages into a trust to be disbursed by a qualified trustee in accordance with the court's schedule.

[4] The United States cited 42 U.S.C. § 233(k) as the basis for its position. In relevant part, that section requires the Secretary of the Department of Health and Human Services to establish a fund, subject to appropriation, "not to exceed a total of $10,000,000 for each . . . fiscal year" for the payment of judgments against the United States for, among other things, damages caused by licensed healthcare practitioners who are deemed employees of the Public Health Service.

secure the full payment of the damages award.  The district court denied Plaintiffs' request, based on "the good faith and credit of the United States."

With respect to the loss-of-future-earnings component of the future-economic-damages award, the district court directed that $1 million of it be paid when E.R.T. reaches the age of 17 1/2 years and the balance be paid on a yearly basis beginning when E.R.T. turns 20.  Finally, as relevant to this appeal, the district court ordered payment of future economic damages into the trust within 30 days of the entry of a decision on appeal.

On appeal, the government does not challenge the district court's liability determination or the total amount of damages awarded.  Instead, the United States raises the following three issues:  (1) it contends the district court should have granted its request for a reversionary interest for the United States in the trust, should E.R.T. meet an untimely demise; (2) it asserts the district court abused its discretion in requiring a lump-sum payment of $1 million in lost-future-earnings-capacity damages to Plaintiffs when E.R.T. becomes 17 1/2 years old; and (3) it argues the district court erred when it required payment within 30 days after we issue a decision on appeal in this case, without regard to whether the United States may seek further review.

Plaintiffs cross-appeal.  They take issue with the district court's decision to authorize periodic payments in the absence of "a bond, security or adequate

7

assurance of 'full payment'" and where the government did not make "full payment" of economic damages immediately in trust, following the entry of judgment.

## II.

## A.

This case raises four questions of law:  (1) whether the district court erred in allowing the United States to pay the future-economic-damages award into a trust to be dispensed periodically; (2) whether the district court erred in determining that the United States has no reversionary interest in such a damages award; (3) whether the district court erred in concluding that the United States has no right to interest in the case of E.R.T.'s premature death; (4) and whether the district court erred in requiring the government to pay the judgment within thirty days of the entry of a decision on appeal.  We conduct *de novo* review of questions of law, *see Sec. & Exch. Comm'n v. Graham*, 823 F.3d 1357, 1360 (11th Cir. 2016), and address each issue in turn below.

1. *The district court did not err in allowing the United States to pay the full damages award into a trust for E.R.T. to be dispensed periodically without requiring the United States to make a security payment for the full amount of damages.*

We first address Plaintiffs' cross-appeal.  As we have noted, Plaintiffs challenge the district court's decision to authorize periodic payments in the absence of "a bond, security or adequate assurance of 'full payment,'" Fla. Stat. §

768.78, and where the government did not immediately make "full payment," *id.*, of economic damages in trust, following the entry of judgment. Essentially, Plaintiffs assert that the district court could adopt the periodic-payment method that section 768.78 authorizes only if it also imposed all of the rest of the section's requirements—full payment or the payment of security guaranteeing full payment—on the government. To resolve this issue, we must consider whether the FTCA—the source of the district court's authority to apply section 768.78— allowed the district court's departure from the strict application of section 768.78.

We begin by examining the FTCA. As relevant here, the FTCA makes the United States generally liable "in the same manner and to the same extent as a private individual under like circumstances."[5] 28 U.S.C. § 2674. To achieve this outcome, courts may "craft remedies that approximate the results contemplated by state statutes." *Dutra v. United States*, 478 F.3d 1090, 1092 (9th Cir. 2007) (citing 28 U.S.C. § 2674; citing also *United States v. Olson*, 546 U.S. 43 (2005)); *see also Lee v. United States*, 765 F.3d 521, 527 (5th Cir. 2014); *Hill v. United States*, 81 F.3d 118, 120-21 (10th Cir. 1996); *Cibula v. United States*, 664 F.3d 428, 433 (4th Cir. 2012); *Askew v. United States*, 786 F.3d 1091, 1093 (8th Cir. 2015).

---

[5] But the FTCA excepts from this rule interest prior to judgment and punitive damages. 28 U.S.C. § 2674.

As we have noted, the government contended in the district court that the court could allow the government to make periodic payments by borrowing that remedy from section 768.78(2)(a)(2).  That provision states,

> (2)(a)  In any action for damages based on personal injury or wrongful death arising out of medical malpractice, . . . in which the trier of fact makes an award to compensate the claimant for future economic losses, payment of amounts intended to compensate the claimant for these losses shall be made by one of the following means:
>
> 2.  The court shall, at the request of either party, enter a judgment ordering future economic damages, as itemized pursuant to s. 768.77, to be paid by periodic payments rather than lump sum.

Fla. Stat. § 768.78(2)(a)(2).  Plaintiffs, however, retort that another aspect of section 768.78(2)—subsection (b)—precludes periodic payments in the absence of the posting of security for the full award.  Subsection (b)(2) provides,

> (b)  For purposes of this subsection, "periodic payment" means provision for the spreading of future economic damages payments, in whole or in part, over a period of time, as follows:
>
> 2.  The defendant shall be required to post a bond or security or otherwise to assure full payment of these damages awarded. . . .  If the defendant is unable to adequately assure full payment of the damages, all damages, reduced to present value, shall be paid to the claimant in a lump sum. . . .  Upon termination of periodic payments, the security, or so much as remains, shall be returned to the defendant.

Fla. Stat. § 768.78(2)(b)(2).

Upon review of these two portions of section 768.78(2), we agree with Plaintiffs that, as a general matter, this statute's use of the mandatory "shall" requires the posting of security if periodic payments are authorized.  *See Sanders v.*

10

*City of Orlando*, 997 So. 2d 1089, 1095 (Fla. 2008) ("The word 'shall' is mandatory in nature."). But that is not the end of our inquiry.

Since the court's job under the FTCA is to "approximate" the results of state statutes, we must consider whether the district court's resolution of the security issue effectively served the same purpose as the statute's security requirement. We find that it did.

The purpose of section 768.78(b)(2)'s security requirement is to guarantee payments to the plaintiff, in case a defendant making periodic payments experiences economic-insolvency problems down the road. *See id.* ("The defendant shall be required to post a bond or security or otherwise *to assure full payment of these damages awarded.*") (emphasis added). So as long as the district court ensured that all periodic payments would be made, it approximated the results of section 768.78(b)(2). Here, the district court accounted for section 768.78(b)(2)'s concern when it noted that the government would be making full payment into the trust for the later dispensing of periodic payments to Plaintiffs. That action in and of itself ensured full payment to Plaintiffs. And even to the extent that the law might prevent the United States from paying more than $10 million at once, the district court determined that "the good faith and credit of the United States" guaranteed full payment. We find no error, based on the unique circumstances of the United States when it is a debtor. *Cf.* Fed. R. Civ. P. 62(e)

11

("The court must not require a bond, obligation, or other security from the appellant when granting a stay on an appeal by the United States, its officers, or its agencies or on an appeal directed by a department of the federal government."); 28 U.S.C. § 2408 ("Security for damages or costs shall not be required of the United States . . . on the issuance of process or the institution or prosecution of any proceeding.").

Nor are we persuaded by Plaintiffs' argument that the United States's failure as of this time to make the lump-sum payment into the trust proves that security was necessary. This argument is flawed: the United States has yet to make the payment because the case is on appeal and judgment is stayed. *See infra* at Section II.A.4.

In short, the district court was not obligated to strictly apply Florida's periodic-payment statute to the United States, nor could it have done so. The court needed only to craft a framework for the United States that *approximated* the results contemplated by state law. And it did just that.

2.  *The district court did not err in concluding that the United States was not entitled to a reversionary interest in any future economic damages remaining in the trust after E.R.T.'s death.*

We now turn to the heart of the United States's appeal: whether the government is entitled to a reversionary interest in any of the future economic damages remaining in the trust if E.R.T. dies prematurely. To resolve this issue,

12

we begin with the language of section 768.78.  If the statutory text is "clear and unambiguous and conveys a clear and definite meaning," our task also ends with the language.  *Diamond Aircraft Indus., Inc. v. Horowitch*, 107 So. 3d 362, 367 (Fla. 2013) (citation and quotation marks omitted).

We find the language of section 768.78(2) to clearly and unambiguously require payment of the full future-economic-damages award, regardless of whether the intended recipient dies before the end of the period for which damages are awarded.  Several aspects of the text require this reading.  For convenience in following our analysis, we reprint all relevant parts of the statute here:

> (2)(a)  In any action for damages based on personal injury or wrongful death arising out of medical malpractice, . . . in which the trier of fact makes an award to compensate the claimant for future economic losses, payment of amounts *intended* to compensate the claimant for these losses shall be made by one of the following means:
>
> 1.  The defendant may make a lump-sum payment for all damages *so assessed*, with future economic losses and expenses reduced to present value; or
>
> 2.  The court shall, at the request of either party, enter a judgment ordering future economic damages, as itemized pursuant to s. 768.77, to be paid by periodic payments rather than lump sum.
>
> (b)  For purposes of this subsection, "periodic payment" means provision for the spreading of future economic damages payments, in whole or in part, over a period of time, as follows:
>
> 1.  A specific finding of the dollar amount of periodic payments which will compensate for these future damages after offset for collateral sources shall be made.  The total dollar amount of the periodic

13

payments shall equal the dollar amount of all such future damages before any reduction to present value.

2.   The defendant shall be required to post a bond or security or otherwise to assure full payment of these damages awarded. . . .  If the defendant is unable to adequately assure full payment of the damages, all damages, reduced to present value, shall be paid to the claimant in a lump sum. . . .  Upon termination of periodic payments, the security, or so much as remains, shall be returned to the defendant.

. . .

Fla. Stat. § 768.78(2) (emphasis added).

First, as we have noted, section 768.78(2) applies when "the trier of fact makes an award to compensate the claimant for future economic losses."  *Id.* § 768.78(2)(a).   That is a one-time occurrence at the end of the fact-finding process—before the trier of fact can possibly know whether the claimant will actually live the expected lifespan and incur all future economic losses anticipated. Section 768.78(2) then sets forth two alternative ways of making "payment of amounts *intended* to compensate the claimant for these losses."  *Id.* (emphasis added).  The use of the word "intended" is significant.  It suggests that the payment of amounts may or may not actually compensate the claimant for his losses— because, at the time the award is made, no one can know with certainty that the claimant will actually require the entire award and nothing more.  In actuality, the claimant may die before receiving the entire award or may outlive the award and incur losses for which the award does not account.  But had the Florida legislature

14

wished for section 768.78(2) to award only actual future economic damages, we expect it would have omitted the word "intended" and written the section to read, "payment of amounts to compensate the claimant for these losses."

Second, subsection (2)(a)(1) bolsters this conclusion. It states that "[t]he defendant may make a lump-sum payment for all damages *so assessed . . . .*" Fla. Stat. § 768.78(2)(a)(1) (emphasis added). "So assessed" refers to the "award to compensate the claimant for future economic losses" described in section 768.78(2)(a). *See id.* at § 768.78(2)(a). And "assessed" means "[t]o charge (a person or property) with a special payment, such as a tax or fine." *Assess*, The American Heritage Dictionary (5th ed. 2011). In other words, at the time the trier of fact determined the award of future economic damages, that award was "assessed," or "charged." It was not subject to revision.

Third, subsection (2)(a)(2) authorizes the award of future economic damages "to be paid by periodic payments *rather than lump sum*." *Id.* at § 768.78(2)(a)(2) (emphasis added). This language suggests that the periodic payments are expected to serve as the equivalent of the "lump-sum payment for all damages so assessed" referred to in subsection (2)(a)(1). The lump-sum payment compensates for the entire award (reduced to present value); it is not subject to revision upon the claimant's early death.

15

Fourth, subsection (2)(b)(1) requires the "*total* dollar amount of the periodic payments [to] *equal* the dollar amount of *all [assessed] future damages* before any reduction to present value." *Id.* at § 768.78(2)(b)(2) (emphasis added). Put simply, this subsection requires the defendant to pay the total of all assessed future economic damages, regardless of whether the defendant does so by lump sum or by periodic payment.

Fifth, subsection (2)(b)(2) requires the posting of security when a defendant chooses to make periodic payments "to assure *full payment* of these damages *awarded.*" *Id.* at § 768.78(2)(b)(2) (emphasis added). So section 768.78(2)(b)(2) recognizes both that the total of all periodic payments is "awarded" at the time the factfinder makes the award of future economic damages and that "full payment" of the amount "awarded" is required. Indeed, this section further cautions, "If the defendant is unable to adequately assure *full payment* of the damages, *all damages*, reduced to present value, shall be paid to the claimant in a *lump sum.*" *Id.* (emphasis added). Once again, the statute equates the total value of all periodic payments with the present value of a lump-sum payment.

And notably, no aspect of section 768.78(2) provides for any kind of reduction to the factfinder's award of future economic damages. The statute likewise makes no contingency for if a claimant outlives his expected lifespan (and therefore his award of future economic damages). In fact, other than reduction to

16

present value, the statute does not allow for adjustments of any kind to the actual damages award.

Therefore, we conclude that the text of section 768.78(2) clearly and unambiguously precludes the award of a reversionary interest should the claimant die before expected.

Nor are we convinced of the contrary by the government's comparison of subsections 768.78(1) and 768.78(2). To explain the government's argument and why we do not find it persuasive, we begin by noting the relationship between the two subsections. While subsection (2) applies in medical-malpractice cases only, subsection (1) sets forth a similar framework for the payment of future economic losses in all other cases where these losses exceed $250,000. *Compare* Fla. Stat. § 768.78(2) *with id.* at § 768.78(1). Subsection 768.78(1)(b) states,

> In entering a judgment ordering the payment of [awarded] future damages by periodic payments, the court shall make a specific finding of the dollar amount of periodic payments which will compensate the judgment creditor for these future damages after offset for collateral sources. The total dollar amount of the periodic payments shall equal the dollar amount of all such future damages before any reduction to present value, less any attorney's fees payable from future damages in accordance with paragraph (f). *The period of time over which the periodic payments shall be made is the period of years determined by the trier of fact in arriving at its itemized verdict and shall not be extended if the plaintiff lives beyond the determined period. If the claimant has been awarded damages to be discharged by periodic payments and the claimant dies prior to the termination of the period of years during which periodic payments are to be made, the remaining liability of the defendant, reduced to present value, shall be paid into the estate of the claimant in a lump sum. . . .*

17

Fla. Stat. § 768.78(1)(b) (emphasis added). So in cases concerning non-medical-malpractice awards of future economic damages, the statute expressly states that when it comes to periodic payments, the amount of monies due is not affected by either the claimant's premature death or by his longer-than-anticipated life. This italicized language, however, is not present in subsection (2).

The government contends that the italicized language's absence from subsection (2) means that payments for future economic losses in medical-malpractice cases cease with the premature death of the claimant. In support of this theory, the government relies on *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), and *Olmstead v. FTC*, 44 So. 3d 76 (Fla. 2010), both of which invoke the canon of statutory construction that "a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute." *Hamdan*, 548 U.S. at 578.

But "[n]o canon of interpretation is absolute." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 59 (2012). And in this case, the canon cannot apply. For if it did, it would require us to reject the plain and unambiguous meaning of section 768.78(2).

Plus, construing subsection (2) to allow for what subsection (1) expressly precludes would also create significant administrative issues for which the statute offers no solutions. Besides prohibiting a reduction of the future-economic-losses

18

award based on actual lifespan, subsection (1) also forbids an enlargement of the future-economic-losses award when the claimant outlives the expected lifespan. Fla. Stat. § 768.78(1)(b) ("The period of time over which the periodic payments shall be made . . . shall not by extended if the plaintiff lives beyond the determined period."). So if, under subsection (2), courts could create a reversionary interest in the case of premature death, by the government's reasoning, they would also have to be able to increase an award in the case of later-than-expected death since subsection (1) precludes enlargements of awards under such circumstances, and that language is not included in subsection (2). And in that case, the statute makes no provision for how a court would impose that increased award. Would the court have to reopen the record and make additional factual findings concerning the new expected lifespan of the claimant? Would the new award be able to be paid in a lump sum or periodically? What about the bond? How would that work?

Such a construction raises an additional problem in this specific case: while the government's proposed interpretation of the statute would require an increase in the award if E.R.T. lives beyond his 30-year life expectancy, there would be no way for the district court to accomplish this task here. That's because, according to the government, *see supra* at n.3, the government cannot be subjected to continuing obligations under the FTCA. That means that the district court would

have no way to approximate section 768.78(2)'s results.  Consequently, the district court could not have authorized the periodic-payment trust in the first place.

For all of these reasons, we conclude that the district court did not err in declining to award the United States a reversionary interest in the trust, in the case that E.R.T. does not live as long as expected.

3. *The district court erred in not awarding the government an interest in (1) the difference between the full value of the balance remaining in the trust in the case of E.R.T.'s premature death and its present value, and (2) the amount of interest that the trust earns solely because the United States paid the entire future-economic-damages award into the trust up front in a lump sum, not reduced to present value.*

Alternatively, the government asserts that if it is not entitled to a reversionary interest in what remains of the future-economic-damages award upon E.R.T.'s death, it is nonetheless entitled at the time of E.R.T.'s death to an interest in (1) the difference between the full value of the remaining balance in the trust and its present value, and (2) the amount of interest that the trust earns solely because the United States paid the entire future-economic-damages award into the trust up front in a lump sum, not reduced to present value.  We agree.

To explain why, we return once again to the FTCA's requirement that any award against the government approximate the same results that private parties would have under the applicable state statute.  Under section 768.78(2)(b), a private party making periodic payments makes the payments over the entire span of the period for which they compensate the claimant, not all at the beginning of

20

that period.  As a result, a private party is able to earn interest on any periodic payments not yet paid.  And a private party paying a single lump sum enjoys the benefit of paying that amount reduced to present value.    Fla. Stat. § 768.78(2)(A)(1).

But the government must deposit up front all the monies to be used to make periodic payments, not reduced to present value.  So it does not have the value of the use of the money slated for later periodic payments during the part of the period before a given periodic payment is due.  To place the government in roughly the equivalent position to a private party, therefore, the government must be able to collect (1) the difference between the full value of any remaining balance at E.R.T.'s death and the balance's present value, and (2) interest earned by the trust solely as a result of the government's payment up front of the total periodic-payment award.

We therefore reverse and remand on this limited issue so the district court may amend the judgment to expressly provide the United States with an interest in these two values.

4.    *The district court erred in setting the United States's deadline for paying the judgment within thirty days of the entry of this decision on appeal.*

Finally, we consider the government's challenge to the district court's deadline for paying the future-economic-damages award into the trust.

In its final judgment, the district court ordered the United States to pay future economic damages into the trust as follows:

> a. if no notice of appeal is filed, within 61 days of the date of this Amended Final Judgment; or

> b. if a notice of appeal is filed, within 30 days of the entry of a decision on appeal. . . .

While the district court's order does not require payment until after the entry of a decision on appeal, it does not account for the possibility that the United States might seek further review by petitioning this Court for rehearing or petitioning the Supreme Court for a writ of certiorari.

Rule 62, Fed. R. Civ. P., however, entitles the United States to a stay of an order awarding money damages until fourteen days after the entry of final judgment following the conclusion of all appeals. More specifically, Rule 62(a) precludes the execution of a money judgment "until 14 days have passed after its entry." And Rule 62(d) entitles an appealing party as a matter of right to have a money judgment against it stayed while the order it challenges is on appeal, provided that the party seeking the stay pays a bond guaranteeing payment if it loses the appeal. *Am. Mfrs. Mut. Ins. Co. v. Am. Broadcasting-Paramount Theatres, Inc.*, 87 S. Ct. 1 (1966) (Harlan, Circuit Justice); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 409 (6th Cir. 2003); *Hebert v. Exxon Corp.*, 953 F.2d 936, 938 (5th Cir. 1992); *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d

755, 760 (D.C. Cir. 1980); *In re Fed. Facilities Realty Tr.*, 227 F.2d 651, 655 (7th Cir. 1955).  Finally, Rule 62(e) entitled, "Stay Without Bond on an Appeal by the United States, Its Officers, or Its Agencies" precludes a court from requiring the United States to post a bond to secure a stay of judgment pending resolution of its appeals.

We understand the mandatory nature of Rule 62(d) to apply equally to motions by the government under Rule 62(e) for a stay of a money judgment pending appeal.  First, the purpose of the stay in both cases is to protect the judgment debtor from "satisfying the judgment only to find that restitution is impossible after reversal on appeal."  *Poplar Grove Planting & Refining Co., Inc. v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1190-91 (5th Cir. 1979).  And second, the purpose of Rule 62(d)'s bond requirement—to protect the claimant pending appeal—does not apply to the United States.  As we have discussed earlier in this opinion, a federal court's money judgment against the United States is already protected without the need for a bond.  So since Rule 62(d) entitles a litigant to a stay of a money judgment pending appeal upon payment of a bond, Rule 62(e) entitles the United States to a stay of a money judgment pending appeal without payment of a bond.  *See Lightfoot v. Walker*, 797 F.2d 505, 507 (7th Cir. 1986).

That means the United States cannot be required to pay the money judgment against it until it has exhausted all appeals it decides to take.  *See* 28 U.S.C. § 2414

23

(requiring the Attorney General of the United States, upon determining that "no appeal shall be taken from a judgment or that no further review will be sought from a decision affirming" a judgment, to so certify, allowing the judgment to be "deemed final"). And it has 45 days to file a petition for rehearing upon entry of our decision and 90 days to seek certiorari. As a result, the district court's order requiring the government to pay the judgment within thirty days of the entry of a decision on appeal cannot stand. We therefore reverse this aspect of the district court's judgment.

**B.**

*The district court did not abuse its discretion when it ordered the United States to make a future-lost-earnings payment when E.R.T. turns 17 and 1/2 years old.*

Next, we consider the United States's challenge to the district court's formulation of the payment schedule for future economic damages. The district court calculated E.R.T.'s future lost earnings by assuming that, had he not been injured, he would have begun his working career at the age of 20. In its final judgment, the district court structured E.R.T.'s future-lost-earnings payment as follows: $1 million to be paid when E.R.T. reaches age 17 and 1/2, and then annual payments of $139,689.20 beginning when he turns 20. On appeal, the United States argues that E.R.T. should not begin receiving payments of future lost earnings until he turns 20 years old because that is when the district court determined he would have started working had he not been disabled at birth.

24

We look once again to section 768.78(2) in determining the appropriate standard of review for this question, since the district court was charged with approximating its effects. As relevant to this issue, section 768.78(2)(b) defines "periodic payment" as "the spreading of future economic damage payments, in whole or in part, over a period of time," as further specified in the statute. Fla. Stat. § 768.78(2)(b). The language allowing for payments of future economic damages "in whole or in part" over a period of time makes it clear that a trial court need not schedule all equal payments when it authorizes periodic payments. And other than the requirement that the "total dollar amount of the periodic payments . . . equal the dollar amount of all . . . future [economic] damages before any reduction to present value," *id.* at § 768.78(2)(b)(1), the statute leaves the trial court free to exercise its discretion in fashioning the periodic-payment schedule. We therefore review for abuse of discretion the district court's decision that E.R.T. shall be paid $1 million for future lost earnings when he turns 17 1/2 and then shall receive annual payments of $139,689.20 beginning when he reaches the age of 20.

The government cites *Pruitt v. Perez-Gervert*, 41 So. 3d 286 (Fla. Dist. Ct. App. 2010), and asserts that the district court abused its discretion because "[t]he purpose of a jury's award of damages for loss of any future earning capacity is to compensate a plaintiff for loss of capacity to earn income as opposed to actual loss of future earnings." Appellant's Br. at 35 (quoting *Pruitt*, 41 So. 3d at 289)

25

(quotation marks omitted).   But we think this statement works against the government's argument:  E.R.T. will not lose his capacity to work at age twenty; rather, he lost his capacity to work when he was injured at birth.  So the district court's schedule requiring the government to pay the first $1 million of the future-lost-earnings award when E.R.T. reaches 17 1/2 does not conflict with the premise of *Pruitt*'s statement.

What's more, the district court gave a reasonable explanation for why it exercised its discretion to schedule a payment to E.R.T. when he turned 17 and 1/2 years old:  to ensure that "there will be money there available to buy a house and . . . fix it and accommodate it so it's ready when he's 18."  The United States itself acknowledged the need for future lost earnings to pay for E.R.T.'s housing when he reaches the age of majority.  At a conference before the district court on June 20, 2017, counsel for the government stated,

> With regards to [E.R.T.] and the house, what was really discussed with the Court, and what the Court I believe decided, was that parents provide housing for a child until that child reaches the age of majority, and then once the child reaches the age of majority that's when their own earnings start to pay for their housing, and that's the reason why the Court didn't include housing except for with the loss of earnings capacity.

At the same conference, the United States requested that the district court "set forth a schedule that applies the facts as were testified to and accepted by this Court to the periodic payment statute."  That is what the district court did.  We find no

26

abuse its discretion in the district court's formulation of the payment schedule for future economic damages.

## III.

For the reasons we have described above, we affirm in part and reverse and remand in part.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**