**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 29, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ALEXIS STOKES, individually and as
guardian and next friend of Baby Boy
D.S., a minor; TAYLOR STOKES,
individually and as guardian and next
friend of Baby Boy D.S., a minor,

      Plaintiffs - Appellees/Cross-
      Appellants,

v.

UNITED STATES OF AMERICA, ex
rel. Indian Health Service & Chickasaw
Nation Medical Center, an agency of the
Chickasaw Nation,

      Defendant - Appellant/Cross-
      Appellee.

Nos. 19-7034 & 19-7035

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:17-CV-00186-JH)**
_____

Casen B. Ross, Attorney, Appellate Staff, United States Department of Justice, Civil
Division, Washington, D.C. (Robert P. Charrow, General Counsel, Brian Stimson,
Principal Deputy General Counsel for Litigation, United States Department of Health
and Human Services; Joseph H. Hunt, Assistant Attorney General, Brian J. Kuester,
United States Attorney, Susan Stidham Brandon, Assistant United States Attorney,
and Abby C. Wright, Attorney, Appellate Staff, United States Department of Justice,
Civil Division, Washington, D.C., with him on the briefs), for Defendant-Appellant.

George W. Braly of Braly, Braly, Speed & Morris, PLLC, Ada, Oklahoma (William
W. Speed and Sheila Southard of Braly, Braly, Speed & Morris, PLLC, Ada,

Oklahoma, and Lawrence R. Murphy Jr. of Smolen Law, Tulsa, Oklahoma, with him on the briefs), for Plaintiffs-Appellees.

_____

Before **BRISCOE**, **McHUGH**, and **MORITZ**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

The district court awarded damages to Baby Boy D.S. (Baby Stokes) and his parents, Alexis Stokes and Taylor Stokes, (collectively, the Stokes) in this Federal Tort Claims Act (FTCA), 28 U.S.C. § 2674, action. The government appeals, arguing that the district court erred in structuring damage payments. The Stokes cross appeal, arguing that the district court erred both by miscalculating the present value of a portion of the award and by awarding too little in noneconomic damages. For the reasons explained below, we affirm in part, vacate in part, and remand.

## Background

An employee of a federally supported health center failed to properly administer a drug to Alexis Stokes while she gave birth to Baby Stokes. As a result, Baby Stokes suffers from "cerebral palsy and spastic quadriplegia," along with other disabilities, and his life expectancy is 22 years. App. vol. 2, 79.

The Stokes brought this FTCA case against the government. After a bench trial, the district court found the government liable and ordered it to pay a total of $15.9 million in damages, including the cost of Baby Stokes's future care and noneconomic damages. As relevant to this appeal, the district court (1) ordered the government to pay the cost of Baby Stokes's future care into a trust, granting the

2

government a diminishing reversionary interest in the trust and permitting the trustee to withdraw funds as needed to provide for Baby Stokes; (2) applied a zero-percent discount rate in calculating the present value of the award for Baby Stokes's future care; and (3) awarded Baby Stokes $1,000,000 in noneconomic damages, Alexis Stokes $500,000 in noneconomic damages, and Taylor Stokes $400,000 in noneconomic damages.[1] The government and the Stokes both appeal.

## Analysis

On appeal, the government does not challenge liability or the amount of damages. It appeals only how the trust is structured with respect to the future-care award. In their cross-appeal, the Stokes argue that (1) the district court applied the wrong discount rate when calculating the present value of the future-care award and (2) their noneconomic damages are erroneously low.[2]

## I. Structure of the Trust

The government argues that the district court erroneously structured Baby Stokes's future-care award by not approximating Oklahoma's periodic-payment statute to the fullest extent possible. The FTCA generally requires courts to hold the

---

[1] The district court initially awarded each of the three Stokes $350,000 in noneconomic damages because of a state-law statutory cap. *See* Okla. Stat. tit. 23, § 61.2(B). But shortly thereafter, the Oklahoma Supreme Court found that statutory cap unconstitutional. *Beason v. I. E. Miller Servs., Inc.*, 441 P.3d 1107, 1109 (Okla. 2019). At the Stokes's request, the district court then increased the noneconomic-damages award.

[2] Citing the limited nature of their appeals, the parties filed an agreed stipulation for partial summary disposition, requesting that we order that the government pay the portion of the damages awarded in the judgment that are uncontested on appeal. We granted that request.

3

government liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances," which includes applying relevant state law. § 2674; *see Hill v. United States*, 81 F.3d 118, 120–21 (10th Cir. 1996). In Oklahoma, private individuals ordered to pay more than $100,000 in future-care damages can request that they pay those damages through periodic payments instead of as a lump sum. Okla. Stat. tit. 23, § 9.3(C).[3] Those payments may not continue for more than seven years. *Id.* If the recipient dies before all periodic payments are made, the statute explains that the "obligation of the defendant [payor] to make further payments ends." § 9.3(H). But courts cannot neatly apply this Oklahoma law to the

---

[3] As relevant here, § 9.3 provides:

C. Upon request of a party, the court may order that future damages be paid in whole or in part in periodic payments rather than by a lump-sum payment. Periodic payments shall not exceed seven (7) years from the date of entry of judgment.

D. The court shall make a specific finding of the dollar amount of periodic payments that will compensate the plaintiff for the future damages. The court shall specify in its judgment ordering the payment of future damages by periodic payments the:

1. Recipient of the payments;
2. Dollar amount of the payments;
3. Interval between payments; and
4. Number of payments or the period of time over which payments must be made.
. . .

H. On the death of the recipient, money damages awarded for loss of future earnings shall continue to be paid to the estate of the recipient of the award without reduction. Following the satisfaction or termination of any obligations specified in the judgment for periodic payments, any obligation of the defendant health care provider to make further payments ends and any security given reverts to the defendant.

4

federal government because they may not order the government to make periodic payments. *Hull ex. rel. Hull v. United States*, 971 F.2d 1499, 1505 (10th Cir. 1992). When facing a situation like this, courts must "approximate the result contemplated by the" state statute. *Hill*, 81 F.3d at 121. And one common way to approximate periodic-payment statues is for the government to pay future damages into an account as a lump sum and then model disbursements from that account around the state's periodic-payment statute. *See, e.g.*, *Dixon v. United States*, 900 F.3d 1257, 1260–61 (11th Cir. 2018) (noting that district court "granted the government's request to make a single payment into a trust for periodic disbursement" to approximate Florida's periodic-payment statute); *Lee v. United States*, 765 F.3d 521, 527 (5th Cir. 2014) (vacating district court order because it "should have structured the [FTCA] damage award in a manner resembling" Texas's periodic-payment statute); *Dutra v. United States*, 478 F.3d 1090, 1092 (9th Cir. 2007) (explaining that "FTCA authorizes courts to craft remedies that approximate the results contemplated by state statutes, and nothing in the FTCA prevents district courts from ordering the United States to provide periodic payments in the form of a reversionary trust"; requiring that FTCA award approximate Washington's periodic-payment statute); *Hill*, 81 F.3d at 121 (ordering district court to create reversionary trust for FTCA award to approximate Colorado's periodic-payment statute).

Here, after trial and in anticipation of a damages award, the Stokes created a trust that (1) permitted the trustee to withdraw funds to care for Baby Stokes as needed and (2) granted the government a 14-year fractional reversionary interest in

5

the future-care award.[4] When the district court awarded damages, it approved this trust structure with one exception: citing § 9.3, it ordered that the trust be modified to ensure that "at the end of seven years no amount is payable to the government." App. vol. 2, 91.

Citing the requirement that it be treated the same as a private individual, the government asked the court to amend its order to more closely model the trust on Oklahoma law. *See* § 2674. Specifically, the government requested that the district court (1) order it to pay a lump sum for the amount of Baby Stokes's future-care award into an account, (2) order the trustee of that account to pay one-seventh of the lump sum to Baby Stokes each year for seven years, and (3) order that in the event Baby Stokes were to die before all payments were made, the remaining funds from the lump sum would revert to the government. The district court declined to modify the trust structure, stating that it "fashioned a remedy [that] approximated the result contemplated by state law but complied with federal law. Strict adherence to state law is not mandated." App. vol. 2, 153.

On appeal, the government argues that the district court erred by not "approximat[ing] the result contemplated by" § 9.3 as required by the FTCA. *Hill*, 81 F.3d at 121; *see also* § 2674. The parties agree that the district court failed to

___

[4] Specifically, the trust provided that, in the event of Baby Stokes's premature death, the government would recover a portion of the future-care award. The trust agreement reduced the amount the government would recover by one-seventh every two years such that after fourteen years, the government would not recover any of the future-care award if Baby Stokes were to die prematurely.

6

approximate all of § 9.3's provisions.[5] But they disagree on whether the district court was required to do so. Because we must hold the government liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances," § 2674, we first consider how the statute would apply to a private party. Next, we determine whether the district court fully approximated that result for the government. In doing so, we interpret § 9.3 de novo.[6] *See Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1024 (10th Cir. 2007); *Dixon*, 900 F.3d at 1261 (reviewing de novo whether the district court erred in applying Florida's periodic-payment statute); *Vanhoy v. United States*, 514 F.3d 447, 451 (5th Cir. 2008) (noting that "[t]he question whether [Louisiana's Medical Malpractice Act] requires the district court to provide protection to the government in the form of a reversionary

---

[5] The government asserts that the district court failed to approximate (1) § 9.3(C) and (D) when it permitted the trustee to withdraw funds from Baby Stokes's future-care award on an as-needed basis, as opposed to structuring withdrawals as set periodic payments, and (2) § 9.3(H) when it granted the government a diminishing fractional reversionary interest, as opposed to granting the government a full reversionary interest in the amount of the future-care award that a private party would not have yet paid if Baby Stokes were to die prematurely. The Stokes do not argue that that district court fully approximated § 9.3(C), (D), or (H).

[6] The Stokes argue that we should review the trust's structure for abuse of discretion. It is true that in *Hull* we reviewed the district "court's decision as to the structure of the [FTCA] award . . . only for an abuse of discretion." *Hull*, 971 F.2d at 1506. But there was no state statute at issue in *Hull*, so our review did not involve statutory interpretation. Moreover, in *Dixon*, which the Stokes rely on for this point, the Eleventh Circuit interpreted Florida's periodic-payment statute de novo. *Dixon,* 900 F.3d at 1261. Only after determining—under de novo review—that Florida's statute "leaves the trial court free to exercise its discretion in fashioning the periodic-payment schedule" did the *Dixon* court review the periodic-payment schedule for abuse of discretion. *Id.* at 1269. Thus, *Dixon* does not support the Stokes's argument and instead provides further support for reviewing this issue de novo.

trust" is one of legal interpretation; reviewing "district court's ruling de novo"). And because we are interpreting an Oklahoma statute, we use Oklahoma's "rules of statutory construction." *Ward v. Utah*, 398 F.3d 1239, 1248 (10th Cir. 2005). So we will not look beyond the statute's text if "the language of the statute is plain and unambiguous." *Antini v. Antini*, 440 P.3d 57, 60 (Okla. 2019).

## A. Application of § 9.3 to a Private Party

Turning to the text of § 9.3, the statute provides that "[u]pon request of a party, the court *may* order that future damages be paid . . . in periodic payments." § 9.3(C) (emphasis added). As the Stokes argue, because § 9.3 permits a private party to request periodic payments, it gives the district court discretion whether to grant that request. *See Okla. Pub. Emps. Ass'n v. State ex rel. Okla. Office of Pers. Mgmt.*, 267 P.3d 838, 845 n.18 (Okla. 2011) ("The term 'may' is ordinarily construed as permissive . . . ."). Focusing on the word "may," the Stokes then argue that none of § 9.3 is mandatory because it "uses the word 'may' rather than 'shall,' thus defining the discretionary nature of implementing (or not) the statute." Aplee. Br. 16 (quoting § 9.3). But the Stokes's argument ignores the remainder of the statute, which repeatedly uses the term "shall" in describing the court's responsibilities. For example, it states that "[p]eriodic payments *shall* not exceed [seven] years" and that the "court *shall* specify . . . [the r]ecipient of the payments," the "[d]ollar amount of the payments," the "[i]nterval between payments," and the "[n]umber of payments or the period of time over which payments must be made." § 9.3(C)–(D) (emphases added). The statute's use of "shall" in these provisions indicates that once a court

8

grants a private party's request to apply the statute, it *must* apply these provisions when structuring payments. *See Keating v. Edmondson*, 37 P.3d 882, 888 (Okla. 2001) (explaining that "shall" "signifies a mandatory directive or command"). As the government notes, under § 9.3, "a private party would never be required to make periodic payments for future life-care expenses on anything other than a fixed schedule . . . . Rather, a private party would *either* make a lump-sum payment *or* be ordered to make periodic payments on a specific schedule set by the court." Aplt. Br. 25.

We agree and conclude that, as applied to a private party, § 9.3 permits the district court discretion to grant or deny a party's request to apply the statute. But, once a court grants that request, the statute's provisions become mandatory.

**B. Approximation of the Result of § 9.3**

Having considered and determined how § 9.3(C) would apply to a private party, we must now decide whether the district court fully "approximate[d] the result contemplated by" § 9.3 as required by the FTCA. *Hill*, 81 F.3d at 121; *see also* § 2674. As such, we must first determine whether the district court granted the government's request to apply the statute. If it did, we must then determine whether the district court fully approximated § 9.3.

The Stokes argue that the district court declined to apply § 9.3 because it "explicitly declined to order periodic payments." Aplee. Br. 23. Specifically, the Stokes point to the district court's order denying the "establishment of a specific payment schedule." App. vol. 2, 154. But, in its initial order awarding damages—and

9

in response to the government's request to structure the trust according to § 9.3—the district court noted that it structured the trust "based on Oklahoma's statute" and, in doing so, cited to § 9.3. App. vol. 2, 90. Moreover, a later order modifying the damages award stated that "the court fashioned a remedy [that] approximated the result contemplated by state law but complied with federal law. Strict adherence to state law is not mandated." App. vol. 2, 153. Thus, the district court clearly did not reject application of § 9.3 in the first instance. Rather, the district court's deviation from § 9.3 appears to stem from a failure to understand its duty to *fully* approximate the result contemplated by the statute, as required by the FTCA. Accordingly, we conclude that the district court granted the government's request to apply § 9.3. Because, as explained above, this decision renders the remainder of § 9.3 mandatory as applied to a private party, we now must determine whether the district court approximated that result for the government. *Hill*, 81 F.3d at 121.

Here, the district court approved a trust that (1) permitted the trustee to withdraw funds to care for Baby Stokes as needed and (2) granted the government a seven-year fractional reversionary interest in the future-care award. The government argues that this structure did not adequately approximate § 9.3. As described above, courts often approximate periodic-payment statues by ordering the government to pay future damages into an account as a lump sum and then modeling disbursements from that account around the state's periodic-payment statute. *See, e.g.*, *Hill*, 81 F.3d at 121 (ordering district court to create reversionary trust for FTCA award to approximate Colorado's periodic-payment statute). And, citing cases where other

10

courts approximated periodic-payment statutes, the government asserts that the district court should have approximated § 9.3 by doing just that. *See, e.g.*, *Askew v. United States*, 786 F.3d 1091, 1093 (8th Cir. 2015) ("[T]o best approximate the results contemplated by the Missouri statutes, the district court should have specified [the tort victim's] future medical damages, created a reversionary trust to hold those funds, and ordered periodic payments of future medical damages from the trust, with the corpus of the trust to revert to the United States upon [victim's] death."); *Lee*, 765 F.3d at 527 ("Although the district court could not impose a continuing obligation on the government, it should have structured the damage award in a manner resembling the periodic[-]payment scheme."). Thus, the government concludes, the district court did not "approximate the result contemplated by" § 9.3 as required by the FTCA. *Hill*, 81 F.3d at 121; *see also* § 2674.

The Stokes argue that the district court was not required to approximate § 9.3 by creating a reversionary trust. In doing so, they first assert that the discretionary nature of § 9.3 makes it "fundamentally different" from the statutes at issue in the FTCA cases the government cites. Aplee. Br. 18. In those cases, courts generally either approved of or ordered the district court to create trust structures similar to what the government requests here. *See, e.g.*, *Askew*, 786 F.3d at 1093; *Lee*, 765 F.3d at 527. But, as the Stokes point out, those cases involved periodic-payment statutes that *require* a court to order periodic payments once a party has requested them, whereas § 9.3 allows a court to deny a party's request. *Compare, e.g.*, *Hill*, 81 F.3d at 120–21 (applying Colorado's periodic-payment statute, Colo. Rev. Stat. § 13-64-203,

which mandates periodic payments in certain circumstances), *with* § 9.3(C) (explaining that "the court *may* order that future damages be paid . . . in periodic payments"). Contrary to the Stokes's argument, however, this distinction does not make § 9.3 "fundamentally different" from the statutes at issue in the government's cases. Aplee. Br. 18. As explained above, § 9.3's provisions became mandatory once the district court granted the government's request to apply the statute. And because § 9.3's provisions are mandatory here, the government's cases are both relevant and support its contention that the district court should have more fully approximated § 9.3.

The Stokes next explain that the government is not actually requesting application of *all* of § 9.3 because the government does not argue that the district court should have better approximated § 9.3(J), a provision which requires periodic payments to include postjudgment interest. And therefore, they maintain, the government's argument that the district court failed to fully approximate § 9.3 is internally inconsistent. But the Stokes do not explain how the district court could have better approximated § 9.3(J).[7] And even assuming that the government's argument is internally inconsistent, the Stokes do not demonstrate how such inconsistency impacts how a court should approximate § 9.3. Thus, the Stokes's § 9.3(J) argument does not alter our analysis.

---

[7] In this section of their brief, the Stokes assert that the government's proposed trust structure would deprive them of earning postjudgment interest, but nothing in § 9.3 limits the Stokes's ability to invest the lump-sum payment, and the government never suggests otherwise.

Finally, the Stokes argue that *Hull* and *Hill* require courts to find that any reversionary interest be in the best interests of the tort victim and that granting the government a full reversionary interest here is not in the best interest of Baby Stokes. Therefore, the Stokes conclude, the district court did not err by failing to fully approximate § 9.3. But the FTCA says nothing about the best interests of the victim, and *Hull* and *Hill* do not suggest otherwise. True, *Hull* acknowledged that district courts may structure FTCA awards according to the best interests of the tort victim. *Hull,* 971 F.2d at 1505. But, as discussed above, *see supra* note 6, Hull did not involve a state statute. Thus, in *Hull*, the fact that future-care awards may be structured in the victim's best interest was not displaced by state law, like it is here.

*Hill* similarly does not indicate that the victim's best interests supersedes the FTCA's requirement to approximate state statutes. True, in *Hill*, we considered the victim's best interests in declining to exercise our inherent authority to order the district court to grant the government a reversionary interest in the victim's future-earnings award. *Hill*, 81 F.3d at 121. But the state periodic-payment statute at issue in *Hill* did not permit reversion of future-earnings awards, so there was no conflict between our decision and the FTCA's requirement to approximate state statutes. *Id.* Thus, like *Hull*, *Hill* does not give courts permission to deviate from the FTCA's approximation requirement, even if doing so is in the best interests of the victim. Accordingly, we decline to deviate from this requirement here.

Based on § 9.3's plain language, we conclude that if a court applies § 9.3 to a private party then it must apply all of § 9.3's requirements. *See Antini*, 440 P.3d at

13

60. And that conclusion, in this case, means the court must approximate that result for the government. *Hill*, 81 F.3d at 121. But, as noted above, the district court did not fully approximate § 9.3. Instead, although it granted the government's request to apply the statute, it did not establish a specific payment schedule, as contemplated by § 9.3(C) and (D). Nor did it provide the government, in the event of Baby Stokes' premature death, a full reversionary interest in any portion of the future-care award that a private party making periodic payments would not yet have made, as contemplated by § 9.3(H). Thus, the district court erred by not approximating the result contemplated by the statute. *See Hill*, 81 F.3d at 121.

\* \* \*

We therefore vacate the portion of the district court's order approving the trust's structure with respect to the future-care award and remand with instructions to approximate § 9.3 to the fullest extent possible. Such approximation should specify the "[r]ecipient of the payments," the "[d]ollar amount of the payments," the "[i]nterval between payments," and the "[n]umber of payments or the period of time over which payments must be made." § 9.3(D). In structuring these payments, the district court should make "a specific finding of the dollar amount of periodic payments that will compensate" Baby Stokes for his future care. *Id.* In addition, the structure should provide that in the event of Baby Stokes's premature death, the government will receive a full reversionary interest in any portion of the future-care award that a private party making periodic payments would not yet have made, as contemplated by § 9.3(H).

14

**II.    Discount Rate**

In their cross appeal, the Stokes argue that the district court erred when it calculated the present value of Baby Stokes's future-care award. When a court awards damages to compensate for losses that will be suffered in the future, the court must reduce the award to present value "to account for the effects of investment" and "the effects of inflation." *Hull*, 971 F.2d at 1510. The parties agree that the proper way to calculate present value is to apply a discount rate, which is the interest rate minus the inflation rate. But the Stokes argue that the district court (1) committed legal error by determining that the discount-rate rule from *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983), did not apply to FTCA cases and (2) committed factual error by relying on an interest rate that is not currently available.

Here, the district court applied a zero-percent discount rate. In doing so, it did not state which interest rate or inflation rate it used, nor did it clearly state the rule it used for determining a discount rate. Instead, the district court stated that it "t[ook] into account the current inflation rate of medical costs, current interest rates, and the disparity between the experts' opinions," and then it concluded "that a net discount rate of [zero] percent is appropriate." App. vol. 2, 88. But the district court did explicitly state that *Pfeifer* does not apply because that case "was not an action brought under the FTCA." *Id.* at 88 n.38.

On appeal, the Stokes first argue that the district court erred by determining that *Pfeifer* does not apply to FTCA cases. Because this is a legal issue, we review it

15

de novo.[8] *See El Encanto, Inc.*, 825 F.3d at 1162 (noting that courts "decide the presence or absence of legal error de novo").

In *Pfeifer*, the Supreme Court stated that, when calculating present value of future awards, the discount rate should reflect the rate of interest that would be "earned on 'the best and safest investments'" that are "available" and should also "represent the after-tax rate of return." *Pfeifer*, 462 U.S. at 537–38 (quoting *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 491 (1916)). As noted above, the district court concluded that *Pfeifer* did not apply here because *Pfeifer* was not an FTCA case. But, as the Stokes explain, we have previously applied *Pfeifer* in an FTCA case.[9] *See Hull*, 971 F.2d at 1511 (citing *Pfeifer* when determining discount rate in FTCA case); *cf. Trevino v. United States*, 804 F.2d 1512, 1519 (9th Cir. 1986) (noting that *Pfeifer*'s "discussion of discount rates technically is only an interpretation of . . . the Longshoremen's and Harbor Workers' Compensation Act" and thus "is not binding in an FTCA case" but that "the Court's guidance on the issue of economic predictions and discount rates [in *Pfeifer*] cannot be disregarded"). And

---

[8] The government argues for a clearly erroneous standard, asserting that the appropriate interest rate is a question of fact. *See Hull*, 971 F.2d 1512 ("We review the district court's choice of a discount rate under a clearly erroneous standard."). But this argument assumes we are reviewing the district court's choice of a zero-percent discount rate for factual error. Instead, we are reviewing the district court's method of selecting a discount rate for "the presence or absence of legal error" and thus apply de novo review. *El Encanto, Inc*, *v. Hatch Chile Co., Inc.*, 825 F.3d 1161, 1162 (10th Cir. 2016).

[9] The district court also implied that *Pfeifer* requires courts to use the "Treasury Bill rate" when calculating interest rates. App. vol. 2, 88 n.38. But *Pfeifer* makes no mention of which investment vehicle is appropriate, as long as that vehicle is a safe investment. *See Pfeifer*, 462 U.S. at 537–38.

16

the government does not argue that *Pfeifer* is inapplicable here—indeed, it cites

favorably to *Pfeifer* in its briefing on appeal. Given our reliance on *Pfeifer* in *Hull*,

we conclude that *Pfeifer* applies to FTCA cases and that the district court committed

legal error in determining otherwise.

We thus vacate the portion of the district court's order calculating the present

value of Baby Stokes's future-care award[10] and remand with instructions to apply

*Pfeifer* in determining the discount rate. But we express no opinion on whether a

zero-percent discount rate itself is incorrect. Although the Stokes argue that, contrary

to *Pfeifer*, this zero-percent discount rate is based on an interest rate that is not

currently available, the district court did not state which interest or inflation rates it

used. Because the district court did not state the basis for its chosen discount rate, we

cannot determine whether this rate is an error. *See Hull*, 971 F.2d at 1511 ("[W]e

remand for the district court to make appropriate findings of fact explaining its

method of calculating present value for all awards for future damages . . . .").

## III. Noneconomic Damages

The Stokes argue that the district court's noneconomic-damages award was too

low. As noted above, the district court ultimately awarded Baby Stokes $1,000,000 in

noneconomic damages, Alexis Stokes $500,000 in noneconomic damages, and Taylor

Stokes $400,000 in noneconomic damages. We "review the award of noneconomic

---

[10] In addition to the future-care award, the district court reduced both Baby Stokes's and Alexis Stokes's lost-future-income awards to present value. But neither party contests these other calculations on appeal, and thus we do not vacate the portion of the order reducing these awards to present value.

damages for clear error, to determine whether 'the award shocks the judicial conscience.'" *Deasy v. United States*, 99 F.3d 354, 360 (10th Cir. 1996) (quoting *Miller v. United States ex rel. Dep't of the Army*, 901 F.2d 894, 897 (10th Cir.1990)). This standard is difficult to meet as "[t]rial courts are vested with broad discretion in awarding damages, and [we] do not lightly engage in a review of a trial court's actions." *Dolenz v. United States*, 443 F.3d 1320, 1321 (10th Cir. 2006) (quoting *Hoskie v. United States*, 666 F.2d 1353, 1354 (10th Cir. 1981)).

The Stokes argue that the amounts of their noneconomic damages are so low that they shock the judicial conscience because (1) they are substantially lower than awards in factually similar cases and (2) Baby Stokes's injuries are so severe. The Stokes first identify other cases that they assert are factually similar, noting that the noneconomic damages awarded to children in those similar cases average about $9.3 million and range from about $7.6 million to $11 million. In response, the government asserts that it is inappropriate under both Tenth Circuit and Oklahoma law to compare awards in factually similar cases when determining whether the award shocks the conscience. But caselaw from both our circuit and the Oklahoma Supreme Court suggest otherwise. *See Hill v. J.B. Hunt Transp., Inc.*, 815 F.3d 651, 670–71 (10th Cir. 2016) (noting that although "[b]oth this court and Oklahoma courts discourage comparisons to awards from other cases, . . . [w]e have made exceptions where a previous case is similar enough to serve as a meaningful benchmark"); *Okla. Ry. Co. v. Strong*, 226 P.2d 950, 952 (Okla. 1951) (noting that when reviewing

18

damages, "[appellate] courts may . . . consider the amount of verdicts rendered in similar cases").

However, we need not resolve this dispute here because even considering the difference between the amounts awarded in the cases the Stokes urge us to consider and the amounts awarded here, the Stokes's noneconomic damage awards do not shock the judicial conscience. This is true even taking into consideration the extent of Baby Stokes's injuries, as the Stokes also urge us to do. Although not necessarily an award we would endorse on de novo review, the district court has wide discretion in determining noneconomic damages. *See Dolenz*, 443 F.3d at 1321. And the Stokes do not meet their high burden of demonstrating that the district court erred in exercising that discretion here. We therefore affirm the portion of the district court's order regarding noneconomic damages.

**Conclusion**

For the reasons stated above, we (1) vacate and remand the portion of the district court's order structuring the trust with respect to Baby Stokes's future-care award, with instructions to fully approximate § 9.3; (2) vacate and remand the portion of the district court's order calculating the present value of Baby Stokes's future-care award, with instructions to apply *Pfeifer*; and (3) affirm the portion of the district court's order regarding noneconomic damages.

19

19-7034, 19-7035, *Stokes, et al. v. United States of America, ex rel. Indian Health Service & Chickasaw Nation Medical Center*

**McHUGH**, Circuit Judge, concurring:

I join in much of the majority's thoughtful analysis and in its conclusion that the district court's judgment should be vacated and the case remanded. I write separately, however, to explain where my analysis differs.

First, with respect to the structure of the Stokes's life care trust: Rather than order the district court to modify the trust so that it complies to the extent possible with the requirements of Oklahoma's periodic payment statute, I would leave the district court free to clarify on remand whether it intended to apply that statute. In my view, the record is not clear in that regard.

Second, with respect to the discount rate applicable to the Stokes's damage award: Rather than leave the district court free to again apply a zero percent discount rate, I would find that its use of a zero percent discount rate for Baby Stokes's life care costs was clear error.

I agree with the panel majority's discussion of noneconomic damages and join that portion of the opinion in full.

## I.        STRUCTURE OF THE TRUST

I agree with the panel majority that if the district court had ordered periodic distributions from the life care trust pursuant to Okla. Stat. Ann. tit. 23, § 9.3, the district court would then be required to approximate the result that would obtain against a private party under all that statute's provisions. But I cannot agree that the district court "granted

the government's request to apply § 9.3." Maj. Op. at 11. The district court did not order periodic trust distributions. And the district court's treatment of Oklahoma law in its various orders is, at best, ambiguous. Accordingly, I would remand so that the district court has an opportunity to clarify its intentions.

Consider the structure of Oklahoma's periodic payments statute. Okla. Stat. Ann. tit. 23, § 9.3 provides that, "[u]pon request of a party, the court *may* order that future damages be paid in whole or in part in periodic payments rather than by a lump-sum payment." *Id.* § 9.3(C) (emphasis added). If a court does order periodic payments, it must "specify in its judgment . . . the: 1. Recipient of the payments; 2. Dollar amount of the payments; 3. Interval between payments; and 4. Number of payments or the period of time over which payments must be made." *Id.* § 9.3(D). But, in any event, "[p]eriodic payments shall not exceed seven (7) years from the date of entry of judgment." *Id.* § 9.3(C).

Section 9.3 also imposes several conditions to guarantee that a defendant makes court-ordered periodic payments:

> As a condition to authorizing periodic payments of future damages, the court shall require a defendant who is not adequately insured to provide evidence of financial responsibility in an amount adequate to assure full payment of damages awarded by the judgment. The judgment shall provide for payments to be funded by:
>
> > 1. An annuity contract issued by a company licensed to do business as an insurance company, including an assignment within the meaning of Section 130, Internal Revenue Code of 1986, as amended;
> >
> > 2. An obligation of the United States;

2

3. Applicable and collectible liability insurance from one or more qualified insurers; or

4. Any other satisfactory form of funding approved by the court.

On termination of periodic payments of future damages, the court shall order the return of the security, or as much as remains, to the defendant.

*Id.* § 9.3(F)-(G).

When the recipient of periodic payments dies, "damages awarded for loss of future earnings shall continue to be paid to the estate of the recipient of the award without reduction." *Id.* § 9.3(H). By contrast, "[f]ollowing the satisfaction or termination of any obligations specified in the judgment for periodic payments, any obligation of the defendant health care provider to make further payments ends and any security given reverts to the defendant." *Id.*

There are three reasons we should be skeptical the district court intended to adopt all, or even most, of § 9.3. First, under our decision in *Hull v. United States*, 971 F.2d 1499 (10th Cir. 1992), a court may not order the United States to make periodic payments. *See id.* at 1505. Strict compliance with § 9.3 is therefore impossible in FTCA actions. The United States concedes as much. But that concession also defeats the United States' argument that the district court "opted-in" to § 9.3 by limiting the partial reversionary interest to seven years. The district court did not "opt-in" to § 9.3; it could not do so because it had no power to order periodic payments.

Second, § 9.3—by its plain terms—never requires periodic payments. It states that a court "*may* order that future damages be paid in whole or in part in periodic payments." *Id.* § 9.3(C) (emphasis added). Because a similarly situated Oklahoma court would not be

3

required to order periodic payments in a non-FTCA case analogous to this one, the district court was not required to do so here.

Third, it would be anomalous for the district court to impose all the various requirements of § 9.3 on this life care trust. For example, § 9.3(F) requires that periodic payments be funded by one of four means, including "[a]n obligation of the United States." *Id.* § 9.3(F)(2). The United States does not argue that it should be required to make a lump sum payment to the life care trust using Treasury bills or some other government-backed instrument. But that is the logical endpoint of its all-encompassing position that the FTCA requires the district court's judgment to approximate Oklahoma law in every possible respect.

To be sure, the district court determined that it would order the life care trust to make payments within seven years "based on Oklahoma's statute." App., Vol. II at 90. In addition, the district court stated that it was doing so "on the basis of the statute rather than plaintiffs' consent." App., Vol. II at 91 n.41. And, the district court later described its prior order as "fashion[ing] a remedy which approximated the result contemplated by state law." App., Vol. II at 153. But the district court was permitted to draw inspiration from Oklahoma's periodic payment statute without adopting it wholesale. Indeed, how could it be otherwise when § 9.3(C) states that periodic payments "shall not exceed seven (7) years" but says nothing about the duration of reversionary interests.

The panel majority sees clarity in the district court's confusing and scattered references to § 9.3 because it proceeds as if the district court were faced with a binary choice between applying some of § 9.3 or none of it. *See* Maj. Op. at 11 (referring to the

4

district court's "duty to *fully* approximate the result contemplated by the statute"). But if § 9.3 does not apply to this life care trust, then the district court possessed "inherent authority" to structure the trust in an alternative way that furthered Baby Stokes's interests.[1] *Hull*, 971 F.2d at 1505.

Because the district court did not order periodic trust distributions, we should not assume that it intended to apply § 9.3. Instead, we should vacate and remand so the district court can clarify its intentions. On remand, the district court should be free (1) to order periodic trust distributions based on § 9.3 or (2) to explain that it elects not to approximate the statutory scheme and to instead show how its alternative arrangement advances Baby Stokes's interests.

## II.     THE DISCOUNT RATE

I agree with the panel majority that the district court misstated the law when it calculated the applicable discount rate, but I would go further and also hold that—on this record—the district court committed clear error in assessing a zero percent discount rate applicable to the damage award for Baby Stokes's future care.

### A.     *Legal Framework*

I agree with the panel majority that the district court was wrong to disregard *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983), when calculating the applicable

---

[1] Unlike the majority, I do not view Oklahoma's statute as a rejection of the "best interests" test. Instead, I see it as the Oklahoma Legislature's attempt to codify a one-size-fits-all procedure to protect the best interests of judgment beneficiaries, while allowing the court to opt out of that procedure if the best interests of the particular beneficiary would be better served outside that framework.

5

discount rate. In *Jones & Laughlin*, the Supreme Court discounted a lump sum damages award "based on the rate of interest that would be earned on 'the best and safest investments'" because an injured plaintiff "is entitled to a risk-free stream of future income to replace his lost wages." *Id.* at 537 (quoting *Chesapeake & Ohio Ry. Co. v. Kelly*, 241 U.S. 485, 491 (1916)). The rate should therefore "not reflect the market's premium for investors who are willing to accept some risk of default." *Id.*

In *Hull*, we applied *Jones & Laughlin* to an FTCA damages award for injuries to a child. "In calculating damages," we explained,

> the trier of fact should discount awards for future damages to present value to account for the effects of investment, but the effects of inflation should also be considered, and, with regard to wages, other factors may need to be considered that may reasonably lead to a projection of increased wages over time.

971 F.2d at 1510–11.

*Hull* cited favorably to our pre-*Jones & Laughlin* decision in *Hoskie v. United States*, 666 F.2d 1353 (10th Cir. 1981). *See* 971 F.2d at 1511. There, we explained that the object of discounting a damages award is to identify "an amount of money that can be invested in a reasonably safe long-term investment available to the average person." *Hoskie*, 666 F.2d at 1355. Applying that rule, we held it was not clear error for a district court to adopt a "9.5 percent discount rate . . . based on the *current yield* of triple A-rated corporate bonds" when calculating the net present value of an FTCA damage award for lost future earnings. *Id.* at 1355 (emphasis added).

Together, these cases teach that the first step in calculating an appropriate discount rate is to identify the best and safest investment available to the plaintiff. After the district

6

court identifies such an investment, the second step is to identify the rate of return that can be earned on that investment. The third step is to subtract the resulting rate of return from the projected rate of inflation (whether for wages, healthcare, general expenses, or any other relevant bundle of goods and services).

I offer two additional observations to assist the district court on remand. First, I disagree with the United States' contention that municipal bonds are categorically a safe and available investment. Appellant Resp. at 26 (citing *Chesapeake & Ohio Ry. Co.*, 241 U.S. at 490). Courts must make specific findings about the current availability of a safe investment or safe set of investments. *Cf. Hoskie*, 666 F.2d at 1355 (referring to "the *current yield* of triple A-rated corporate bonds" (emphasis added)).

I therefore also disagree with the plaintiffs' contention that "the only risk free and available investment vehicle" is a portfolio of Treasury bills. Appellee Resp. at 34. In fact, the testimony at trial indicated otherwise. For example, on cross-examination, the defense expert agreed that certain high-grade municipal bonds are "representative of a highly secure investment." App., Vol. V at 181.

Second, I note that historical rates of return are one tool that can help a district court estimate future returns but are not an end unto themselves. "We cannot deny history, nor can history provide an always reliable basis for predicting the future." *Trevino v. United States*, 804 F.2d 1512, 1518 (9th Cir. 1986). In this field of "rough approximation," *Jones & Laughlin*, 462 U.S. at 546, expert testimony on the usefulness of historical data deserves careful consideration. *E.g.*, App., Vol. IV at 121 (expert testimony that it would not be appropriate to calculate a discount rate using historic

municipal bond yields because "we don't know if [those rates] will ever return"); *see also Trevino*, 804 F.2d at 1518 (criticizing a district court's interest-rate calculation because "it relied on an unrepresentative timespan").

### B. Clear Error

"We review the district court's choice of a discount rate under a clearly erroneous standard." *Hull*, 971 F.2d at 1512. The district court committed clear error by adopting a rate of return that the parties' experts agreed is not currently available to the plaintiffs.

First, some housekeeping. The panel majority states: "Because the district court did not state the basis for its chosen discount rate, we cannot determine whether this rate is an error." Maj. Op. at 18. But in *Hull*, we stated: "Because the district court adopted the figure proposed by [an] expert, we may conclude that the district court also adopted the expert's methodology." *Hull*, 971 F.2d at 1512.

The district court adopted a figure within the defense expert's range of proposed discount rates (zero to 1.82 percent) and above the plaintiffs' expert's proposed discount rate (below zero). Consequently, we may review the correctness of the defense expert's methodology, which employed historical average rates of return on high-grade municipal bonds.[2]

---

[2] The panel majority observes, accurately, that the defense expert calculated "three separate discount rates each applying to a different component of the future-care award." Maj. Op. at 19 n.13. But the defense expert calculated all three of those discount rates using the historical rate of return on high-grade municipal bonds. That is where the error lies.

8

On this record, the district court committed clear error by relying on the defense expert's methodology. The defense expert calculated a historical rate of return on high-grade municipal bonds of 5.92 percent. At trial, plaintiffs' counsel asked the plaintiffs' expert whether there are "any Triple A rated municipal bonds that are presently available with an interest rate anywhere close to 5.92 percent," and he answered, "No. None that have a decent rating anyway. Maybe you could buy some, what they call garbage bonds. But that wouldn't be satisfactory either because they're not risk free." App., Vol. IV at 145. Likewise, the defense expert acknowledged on cross examination that he would "be surprised if by the end of the year [the Stokes could] find a high-grade municipal bond yielding 5.92 percent." App., Vol. V at 173.

In sum, the district court committed clear error by adopting a discount rate that relied on a rate of return not available to the plaintiffs were they to promptly invest the life care portion of their damage award in the best and safest investment. I therefore concur in the panel's decision to vacate and remand so the district court may calculate a new discount rate.